WRIGHT, FINLAY & ZAK, LLP
Darren T. Brenner, Esq.
Nevada Bar No. 8386
Christina V. Miller, Esq.
Nevada Bar No. 12448
Lindsay D. Dragon, Esq.
Nevada Bar No. 13474
7785 W. Sahara Ave., Suite 200
Las Vegas, NV 89117
(702) 475-7964; Fax: (702) 946-1345
ldragon@wrightlegal.net
*Attorneys for Plaintiff, U.S. Bank National Association as Legal Title Trustee for Truman 2016 SC6 Title Trust*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION AS LEGAL TITLE TRUSTEE FOR TRUMAN 2016 SC6 TITLE TRUST,<br><br>Plaintiff,<br><br>vs.<br><br>FIDELITY NATIONAL TITLE GROUP, INC.; FIDELITY NATIONAL TITLE INSURANCE COMPANY; DOE INDIVIDUALS I through X; and ROE CORPORATIONS XI through XX, inclusive,<br><br>Defendants. | Case No.: 2:21-CV-01454-JCM-NJK<br><br>**FIRST AMENDED COMPLAINT**<br><br>**ARBITRATION EXEMPT: ACTION FOR DECLARATORY RELIEF** |

Plaintiff U.S. Bank National Association as Legal Title Trustee for Truman 2016 SC6 Title Trust ("U.S. Bank"), by and through its attorneys of record, Darren T. Brenner, Esq. and Christina V. Miller, Esq., of the law firm of Wright, Finlay & Zak, LLP, submits its Complaint against Fidelity National Title Group, Inc. ("Fidelity"), Fidelity National Title Insurance Company ("Fidelity National"), Doe Individuals I through X ("Does") and Roe Corporations XI through XX, inclusive ("Roes") (collectively, "Defendants"), for breach of their obligations to defend and indemnify U.S. Bank under a title insurance policy issued to insure a deed of trust on real property located in Nevada.

Title insurers, like Defendants, have known since the early 1990's that homeowners associations in some states, including Nevada, impose liens that can attain superpriority over senior mortgages and deeds of trust. Title insurers are the experts on title, and lenders like U.S. Bank rely upon and pay them handsomely for their expertise and protection.

Title insurers, like Defendants, have acknowledged the coverage that U.S. Bank claims is due and owing in their manuals.

### *Parties, Jurisdiction and Venue*

1. Plaintiff U.S. Bank is a national banking association chartered under the laws of the United States with its main office in Ohio and doing business in Clark County, Nevada.

2. Defendant Fidelity is a Florida corporation with its principal place of business in Florida and doing business in Clark County, Nevada.  Fidelity is a wholly owned subsidiary of FNTG Holdings, LLC, a Delaware limited liability company. FNTG Holdings is a 100% wholly owned subsidiary of Fidelity National Financial, Inc., a Delaware corporation that is publicly traded on the New York Stock Exchange under the ticker symbol "FNF."

3. Defendant Fidelity National is a Nebraska corporation with its principal place of business in Florida and doing business in Clark County, Nevada.  Fidelity National is a wholly owned subsidiary of Fidelity. Fidelity National is the successor-in-interest to Lawyers Title Insurance Corporation ("Lawyers Title").

4. U.S. Bank does not know the true names, capacities or bases of liability of fictitious defendants sued as Does I through X and Roe Corporations XI through XX, inclusive (collectively "fictitious Defendants").  Each fictitiously named defendant is in some way liable to U.S. Bank.  U.S. Bank will amend this Complaint to reflect the true names of said defendants when the same have been ascertained.

5. This matter is exempt from Arbitration as U.S. Bank has requested a declaration that the Policy provided coverage for all losses or damages, up to the Amount of Insurance, sustained by U.S. Bank as a result of the HOA's foreclosure sale.

6. This Court has personal jurisdiction over Defendants because they have engaged in the business of issuing title insurance policies insuring deeds of trust on land located in the

State of Nevada and therefore have sufficient contacts with the State to have availed themselves of the State's jurisdiction.

7.    This Court has personal jurisdiction over Fidelity because it has purposefully availed itself of this forum by intentionally directing its subsidiaries to tortiously deny coverage under the insurance policies described below and by making or facilitating the coverage decisions of Fidelity National regarding thousands of claims upon policies affecting insured interests on real property located in Nevada.

8.    Venue is appropriate in this Court because this judicial district is where a substantial part of the events giving rise to U.S. Bank' claims took place, and it is the location of the property subject to the insured deed of trust that is at the core of this lawsuit.

### *Nature of Title Insurance*

9.    A title insurance policy is a contract through which the insurer is paid one sum in consideration for agreeing to indemnify the insured up to a specified amount against loss caused by encumbrances upon or defects in the title to real property in which the insured has an interest.

10.    Lenders such as U.S. Bank often seek to obtain title insurance policies in connection with loans they advance that are secured by interests in real property. The title insurance policy generally protects the lender against risks associated with loss of title or practical use of the property, subject to the policy's terms, exclusions, and conditions.

11.    This lawsuit concerns the issuance of a title insurance policy in favor of RMS & Associations, its successors and/or assigns.[1]  U.S. Bank is the insured entity under the Policy.

12.    Before 2014, Defendants issued to U.S. Bank (or U.S. Bank' predecessors-in-interest) a number of title insurance policies.

13.    The large majority of insurance policies issued by Fidelity National, its predecessor Lawyers Title, and their issuing agents use standard forms promulgated by the American Land Title Association ("ALTA") and the California Land Title Association ("CLTA").

---

[1] A true and correct copy of the Title Insurance Policy is attached as **Exhibit 1**. *See id.* at Schedule A.

14.     ALTA and CLTA are trade groups made up of representatives from the major title insurance underwriters and issuers, including Defendants.

15.     These standard ALTA and CLTA forms are used by multiple title insurers, which publish guides concerning the coverage (and exceptions thereto) provided by the standard policy. The standard ALTA policy form has been revised from time to time, including changes in 1992, 2006, and 2012.

16.     There are a number of ALTA standardized endorsement forms that can be issued with the standard policy to modify the scope of coverage available.  Defendants have also used CLTA standardized endorsement forms from time to time.

17.     Non-party, Chicago Title Insurance Company, another title insurer within the Fidelity network, issued a 2013 Endorsement Manual which states that "endorsements will provide additional coverage for matters which would ordinarily be excluded by the Exclusions From Coverage, or excepted from coverage shown in Schedule B of" a title insurance policy.[2]

18.     This is consistent with trade usage of the term "endorsement" among title insurers and their insureds.  *See, e.g.*, Joyce D. Palomar, *Title Insurance Law* § 9:1 (2013-14 ed.) (explaining that endorsements serve two primary purposes: (1) "they may provide affirmative coverage for facts that exist in a transaction which standard title insurance policies have not traditionally addressed," or (2) they "may 'insure over' or modify the effect of preprinted policy exclusions or exceptions").

19.     Lenders commonly request that title insurers issue ALTA Endorsement Form 9 ("Form 9"), or its CLTA equivalent, CLTA Endorsement Form 100 ("Form 100").  These "comprehensive" endorsements provide a range of guarantees to the insured relating to the existence of covenants, conditions, or restrictions affecting or governing the property which could cause damage to the insured lender's interest at the time the policy is issued or in the future.

20.     Form 100 is the equivalent of Form 9.

---

[2] A true and correct copy of Chicago Title's 2013 Endorsement Manual is attached as **Exhibit 2**.

21.    It is commonly understood between title insurers and their insureds that Form 9/Form 100 "[p]rovides comprehensive coverage for [an] insured ALTA lender against loss by reason of present *or future* [covenants, conditions and restrictions] violations[.]"[3]

22.    Lenders often also request that title insurers issue ALTA Endorsement Form 4 ("Form 4"), or its CLTA equivalent, CLTA Endorsement Form 115.1 ("Form 115.1"). Form 4/Form 115.1 endorsements "[p]rovide[] coverage for an insured ALTA lender against loss concerning violations of CC&Rs [and/or] homeowners association charges and assessments."[4]

23.    Form 4 is the equivalent to Form 115.1.[5]

24.    Fidelity exerts control over its subsidiaries, including Fidelity National, by determining the terms and conditions upon which they will insure title to real property, dictating policies and procedures that govern how they will evaluate claims, and directing them to deny certain categories of claims.

25.    Fidelity's Claims Department is based out of two locations in Omaha, Nebraska and Jacksonville, Florida. The Claims Department processes claims submitted under title insurance policies underwritten by all of Fidelity's wholly owned subsidiaries, including Fidelity National and Fidelity Nevada. To promote consistent coverage positions among its subsidiaries, Fidelity provides its Claims Department with instructions and other claims handling guidance, including directives as to which position the subsidiaries should take as to coverage on a claim.

### Defendants Issued Policies Understood to Cover Nevada Superpriority Liens

26.    In 1982, the Uniform Law Commission promulgated the Uniform Common Interest Ownership Act ("UCIOA"). UCIOA provided a number of standardized terms governing the formation of common interest associations, including condominium associations and homeowners associations.

27.    As relevant here, UCIOA provided that homeowners associations' covenants, conditions, and restrictions included a "superpriority" lien for unpaid assessments, which came

---

[3] A true and correct copy of Fidelity's Endorsement Guide is attached as **Exhibit 3** (emphasis added).

[4] *Id.*

[5] *Id.* at 3.

into existence when the association was formed (i.e., when its declaration of covenants, conditions, and restrictions were recorded), and would take priority over a subsequently recorded mortgage or deed of trust even if no assessments were due at the time the mortgage or deed of trust was recorded.

28.     In 1991, the Nevada Legislature adopted the 1982 version of UCIOA, codifying it in Chapter 116 of the Nevada Revised Statutes.

29.     Chapter 116 includes NRS 116.3116, which, at the time of the events relevant to this suit, stated in relevant part:

> 1.   The association has a lien on a unit for any construction penalty that is imposed against the unit's owner pursuant to NRS 116.310305, any assessment levied against that unit or any fines imposed against the unit's owner from the time the construction penalty, assessment or fine becomes due. . . .
>
> 2.   A lien under this section is prior to all other liens and encumbrances on a unit except:
> . . .
> (b) A first security interest on the unit recorded before the date on which the assessment sought to be enforced became delinquent . . . ;
> . . .
> The lien is also prior to all security interests described in paragraph (b) to the extent of any charges incurred by the association on a unit pursuant to NRS 116.310312 and to the extent of the assessments for common expenses based on the periodic budget adopted by the association pursuant to NRS 116.3115 which would have become due in the absence of acceleration during the 9 months immediately preceding institution of an action to enforce the lien . . . .
> . . .
> 4. Recording of the declaration constitutes record notice and perfection of the lien. No further recordation of any claim of lien for assessment under this section is required.

30.     Under NRS 116.3116, from the time an association's covenants, conditions, and restrictions are recorded, the properties governed by the association are encumbered by a lien that secures all assessments.  Chapter 116 does not require that an association record a separate lien before the lien is foreclosed.

31.     As part of its adoption of UCIOA, the Nevada Legislature also enacted NRS 116.1104:

> Except as expressly provided in this chapter, [NRS 116's] provisions may not be varied by agreement, and rights conferred by it may not be waived. Except as otherwise provided in paragraph (b) of subsection 2 of NRS 116.12075, a declarant may not act under a power of attorney, or use any other device, to evade the limitations or prohibitions of this chapter or the declaration.

32.     The Nevada Legislature also enacted NRS 116.1206(1):

> Any provision contained in a declaration, bylaw or other governing document of a common-interest community that violates the provisions of this chapter shall be deemed to conform with those provisions by operation of law, and any such declaration, bylaw or other governing document is not required to be amended to conform to those provisions.

33.     Defendants and other title insurers were aware of Nevada's adoption of NRS 116, including its provision of a "superpriority" lien in a homeowners association's covenants, conditions, and restrictions.

34.     Defendants and other title insurers believed they could be liable for an insured's losses caused by the enforcement of an association's superpriority lien if the policy at issue contained in Form 9/Form 100 and/or Form 4/Form 115.1.

35.     In a bulletin dated December 12, 1991, non-party Stewart Title Guarantee Company ("Stewart Title") sent its issuing agents in eleven States (including Nevada) a bulletin indicating that ALTA Form 9 and ALTA Form 4 would provide coverage for losses caused by associations' superpriority liens.[6] Stewart Title provided specific instructions to its agents to delete Paragraph 2 of ALTA Form 9 before including either endorsement with a title insurance policy.[7]

36.     In July 1993, Stewart Title issued a bulletin to its issuing agents in twelve States (including Nevada) indicating that "future assessments (usually six months) have priority over a prior mortgage," and that if the issuing agents were issuing ALTA Form 9 with their policies, they should add the following exception to ALTA Form 9: "The Policy and any endorsements to

---

[6] A true and correct copy of Stewart Title's 1991 Bulletin is attached as **Exhibit 4.**
[7] *Id.*

the Policy do not insure against loss because of condominium assessments not yet due and payable."[8]

37.    Stewart Title's bulletins are available to the public on the Internet. Fidelity's bulletins, underwriting manuals, and pre-2013 endorsement manuals are not.

38.    On information and belief, between 1991 and 2014, Fidelity provided instructions to their issuing agents to modify Form 9/Form 100 and Form 4/ Form 115.1 before issuing any policy in Nevada for a property governed by a homeowners association in recognition of the coverage provided under these forms.

39.    In 2007, non-party LandAmerica Financial Group, Inc., whose assets and brand were later acquired by Fidelity, issued to its subsidiaries (which have also been acquired by Fidelity), an Underwriting Manual which quotes Paragraph 1(a) of Form 9 and provides the following underwriting guidelines for issuing a policy with Form 9:[9]

> 1.    Any incorrectness in the assurance that, at Date of Policy:
>
>     a)    There are no covenants, conditions or restrictions under which the lien of the mortgage referred to in Schedule A can be divested, subordinated or extinguished, or its validity, priority or enforceability impaired.
>
> To give this coverage, the underwriter must review all covenants, conditions and restriction listed in the title report to determine if there is language which could result in forfeiture, reversion or other impairment. Note that other impairment is added to traditional forfeiture or reversion. This includes a provision permitting a home owners or civic association to levy an assessment, secured by a lien with priority over the insured deed of trust. Under the Property Owners Association Act, 55-508, et seq., some owners associations can levy for limited purposes, with limited super-priority.

40.    On information and belief, between 1991 and the present, Defendants have published and/or follow similar underwriting manuals and instructions indicating that Paragraph 1(a) of Form 9/Form 100 provides coverage for losses due to "provision[s] [in recorded covenants, conditions and restrictions] permitting a home owners or civic association to levy an assessment, secured by a lien with priority over the insured deed of trust."

---

[8] A true and correct copy of Stewart Title's 1993 Bulletin is attached as **Exhibit 5.**
[9] A true and correct copy of LandAmerica's Underwriting Manual is attached as **Exhibit 6**.

41.     From 1991 until the present, Defendants have provided endorsement manuals for their issuing agents explaining the scope of coverage provided by Form 9/Form 100 and Form 4/ Form 115.1.

42.     On information and belief, Defendants' pre-2012 endorsement manuals informed their issuing agents that Form 9/Form 100 and Form 4/ Form 115.1 would provide coverage to an insured that suffered loss or damage due to an association's lien for assessments that became delinquent after the date of policy.

43.     However, even after the amendments to Form 9/Form 100 and Form 4/Form 115.1, Defendants have promulgated endorsement manuals indicating that the operative language in earlier versions of the forms – including the earlier version of Form 100 and Form 115.1 at issue in this case – would provide coverage to an insured for losses or damages suffered as a result of the enforcement of an association's superpriority lien.

44.     In the 2013 Endorsement Manual that Fidelity provided for the use of all of its subsidiary underwriters and their agents, Fidelity explained that certain language from Form 9/Form 100 should not be used in policies where "a FUTURE violation might result in the loss of priority or enforceability of the lien of the Insured Mortgage," indicating Fidelity's belief that the language created coverage for the insured.[10]

45.     Similarly, Fidelity's 2013 Endorsement Manual states that Form 5/Form 115.2 insures against "loss from lack of priority of the mortgage lien over the lien for homeowners' association assessments."[11] The Manual states that Form 5 insures priority over FUTURE assessments; whereas Form 5.1 only insures against loss resulting from assessments due and unpaid at date of policy.[12]

46.     Contemporary trade usage describing the terms and scope of Form 9/Form 100 indicates that those endorsements provide coverage for an insured lender in the event that

---

[10] A true and correct copy of Fidelity's 2013 Endorsement Manual is attached as **Exhibit 7**. *Id.* at 66.

[11] *Id.* at 18, 39.

[12] *Id.* at 39. ALTA 5/CLTA 115.2 is the substantive equivalent to ALTA 4/CLTA 115.1, but applies to properties within a planned unit development.

covenants, conditions, and restrictions of record at the date of the policy allow an association's lien to take priority over the insured mortgage or deed of trust. *See, e.g.*, Barlow Burke, LAW OF TITLE INSURANCE § 10.05[B] (3d ed., 2002 Supp.) (in describing Form 9: "A second type of endorsement of interest to an insured lender is one covering the loss of lien priority because of the enforcement of a private covenant applicable to the title. … The priority of these covenants, restrictions, and conditions is particularly important to mortgage lenders with loan policies because their supporting documents, also recorded, typically include the power to compel the payment of amounts for the maintenance and repair of the common facilities in a large subdivision. Often the exercise of these maintenance and repair functions is put in the hands of a subdivision homeowner's association. It also typically holds a lien to compel the payment of these amounts, and that lien also has priority over later recorded mortgage."); *id.* ("Future violations [of covenants, conditions, and restrictions] are also insured against, but only to the extent that the violations occur between the policy date and the acquisition of title in any foreclosure action, provided the violation causes the insured to be insecure or results in loss or damage to the title acquired by the insured in satisfaction of the secured debt, as where the insured takes a deed in lieu of foreclosure." (citing ALTA Form 9 ¶¶ 1(a), 2)).

47. Defendants represented to the public and to U.S. Bank's predecessor-in-interest that Form 9/Form 100 and Form 4/Form 115.1 provided coverage against losses caused by an association's superpriority lien.

48. Despite having actual knowledge of the possibility that U.S. Bank could lose its security interest in properties that were governed by homeowners associations, at no time did Defendants inform U.S. Bank or its predecessors-in-interest of the danger of losing its security interests in such properties.

49. Defendants implemented patterns and practices which call for the denial of claims stemming from Nevada HOA foreclosure sales despite Defendants' actual knowledge that the claims fell under the insuring provisions and policy endorsements.

/ / /

/ / /

### *The Nevada Supreme Court Interprets NRS 116.3116*

50.    In *SFR Investments Pool 1, LLC v. U.S. Bank, N.A.*, 130 Nev. 742, 334 P.3d 408 (2014), the Nevada Supreme Court confirmed that a portion of the lien included in a Nevada homeowners association's covenants, conditions, and restrictions has superpriority over a recorded first deed of trust.

51.    The Court further held that NRS 116.1104 rendered inoperative clauses in associations' covenants, conditions, and restrictions that purported to allow senior deeds of trust to survive an association's foreclosure of the superpriority lien provided in its covenants, conditions, and restrictions.

52.    *SFR Investments* confirmed that the proper foreclosure of an association's superpriority lien extinguishes a recorded senior deed of trust on the same property.

53.    Following *SFR Investments*, Stewart Title issued a bulletin to its agents in Nevada indicating that "in lieu of issuing a[] [Form 9] for a lender's policy," its agents should "issue the ALTA 9.10."[13] Additionally, the underwriters were also instructed that "in lieu of issuing an ALTA 5 for a lender's policy" to issue the ALTA 5.1 instead."[14] Stewart Title issued a similar instruction for Form 4/Form 115.1.[15]

54.    Other title insurance companies have issued similar bulletins as a result of the decision in *SFR Investments*.

55.    Upon information and belief, Fidelity and Fidelity National sent similar bulletins to their agents following *SFR Investments*, indicating their belief that Form 9/Form 100 and Form 4/Form 115.1 provided coverage for losses caused by superpriority liens.

56.    In *K&P Homes v. Christiana Trust*, 133 Nev. 364, 398 P.3d 292 (2017), the Nevada Supreme Court held that *SFR Investments* "did not create new law or overrule existing precedent; rather, that decision declared what NRS 116.3116 has required since the statute's inception" in 1991.

---

[13] A true and correct copy of Stewart Title Bulletin NV2014002 is attached as **Exhibit 8**.
[14] *Id.*
[15] *Id.*

57.     Under controlling Nevada law, the covenants, conditions, and restrictions at issue here have provided the association with a lien that could attain priority over a senior deed of trust since 1991.

### Facts Specific to this Case

58.     This action concerns real property located at 4575 Dean Martin Drive, Unit 1500, Las Vegas, Nevada 89103, APN: 162-20-312-149 ("Property").

59.     The Property is subject to Declaration of Covenants, Conditions, and Restrictions ("CC&Rs") for Panorama Towers Condominium Unit Owners Association ("HOA").[16]

60.     The CC&Rs, including Article 17, section 17.1, creates the HOA's lien and establishes that the owner of property governed by the HOA "covenants and agrees" to pay all assessments made pursuant to the Declaration.[17]

61.     Additionally, the Declaration recitals establish the HOA's intent that the covenants in the CC&RS are to run with the land:

> Each of the provisions of this Declaration shall run with and burden the Property and shall be binding on and for the benefit of all of the Property[.][18]

62.     Moreover, Section 17.1 of the CC&Rs specifically states: "All such Assessments, together with any and all late charges, fines, interest, attorneys fees and other costs or expenses incurred by the Association in collecting unpaid amounts shall be a charge on the Unit[.]"[19]

63.     Thus, pursuant to the CC&Rs, an owner of property governed by the HOA covenants to pay assessments, and those assessments constitute a charge on the land secured by a continuing lien that has encumbered the property since the CC&Rs were recorded and assessments were first charged.

64.     Additionally, Section 17.12(d) states that the HOA may foreclose its lien in accordance with the "Act", defined in the CC&Rs to "mean the Uniform Common Interest

---

[16] A true and correct copy of the HOA's 2006 CC&Rs are attached as **Exhibit 9**.
[17] *Id*. at 74.
[18] *Id*. at 2.
[19] *Id*. at 74.

Ownership Act as adopted in Nevada, as set forth in NRS Chapter 116 and the rules and regulations promulgated thereunder[.]".”[20]

65.    Regardless of whether the CC&Rs incorporate NRS 116.3116 by reference, the CC&Rs are deemed to "conform" and incorporate NRS 116.3116 by operation of law.  *See* NRS 116.1206(1) ("Any provision contained in a declaration, bylaw or other governing document of a common-interest community that violates the provisions of this chapter shall be deemed to conform with those provisions by operation of law, and any such declaration, bylaw or other governing document is not required to be amended to conform to those provisions.").

66.    Thus, the CC&Rs provided the HOA with a superpriority lien over the lien of the insured mortgage as of the Date of Policy.

67.    On or about August 1, 2007, RMS & Associates ("Lender") provided a $900,000.00 loan to Annette Lexis ("Borrower") to finance the purchase of the Property.

68.    By purchasing the Property, Borrower covenanted "to pay to [the HOA] annual assessments or charges[.]"

69.    On or about August 3, 2007, Borrower executed a deed of trust ("Deed of Trust"), providing a security interest in the Property in favor of Lender.[21]

70.    The Deed of Trust, along with the promissory note and all indebtedness due thereunder, was subsequently assigned to U.S. Bank.[22]

71.    As part of the loan origination, Fidelity National's predecessor in interest, entered into a contractual relationship with Lender as the insured on a lender's title insurance policy, numbered K56-Z030798 ("Policy"), to insure that the Deed of Trust was superior to competing liens, including the HOA's lien.[23]

72.    Defendants are responsible for providing coverage that insured the Deed of Trust in first position over all other liens, and other representations contained in the Policy.

---

[20] *Id*. at Section 1.1, p.2.
[21] A true and correct copy of the recorded Deed of Trust is attached as **Exhibit 10**.
[22] A true and correct copy of the recorded Assignment of Deed of Trust is attached as **Exhibit 11**.
[23] *See* **Ex. 1** (Title Policy) at Schedule A.

73.    Additionally, Fidelity National, through its predecessor in interest, agreed to undertake the obligation of procuring, issuing, and/or providing coverage that insured the Lender's Deed of Trust was in superior position over the HOA's lien.

74.    On information and belief, Lender intended that the loan would be transferred to U.S. Bank shortly after origination and, therefore, intended that all rights, promises and protections guaranteed to it during the escrow and origination process, as reflected in the escrow and origination documents, including but not limited to the HUD-1 Settlement, Preliminary Title Report, Lender's Closing Instructions and Title Policy, would be for the benefit of U.S. Bank and would transfer to U.S. Bank as if U.S. Bank had been a party to the escrow and origination of the loan.

75.    The Policy obligates Fidelity National to pay the costs, attorneys' fees, and expenses incurred in underlying quiet title action, defense or title, and/or the lien of the Deed of Trust, as insured.

76.    "An insurer's duty to defend is triggered whenever the potential for indemnification arises, and it continues until this potential for indemnification ceases." *Nautilus Ins. Co. v. Access Med., LLC*, 482 P.3d 683, 687 (Nev. 2021) (quoting *Benchmark Ins. Co. v. Sparks*, 127 Nev. 407, 412, 254 P.3d 617, 621 (2011)). There is a potential for indemnification when the allegations in the third party's complaint show that there is "arguable or possible coverage," (*internal citation omitted*) or when the insurer "ascertains facts which give rise to the potential of liability under the policy[.]" *Id*. (quoting *Century Sur. Co. v. Andrew*, 134 Nev. 819, 821, 432 P.3d 180, 183 (2018)). "The insured pays a premium for the expectation that the insurer will abide by its duty to defend when such a duty arises." *Century Sur.*, 134 Nev. at 822, 432 P.3d at 184. "In Nevada, that duty arises "if facts [in a lawsuit] are alleged which if proved would give rise to the duty to indemnify," which then the "insurer *must* defend." *Id*. (quoting *Rockwood Ins. Co. v. Federated Capital Corp.*, 694 F. Supp. 772, 776 (D. Nev. 1988) (emphasis added in original). Facts outside of the complaint cannot justify an insurer's refusal to defend its insured." *Id.,* 134 Nev. at n.4, 432 P.3d at n. 4. *Century Surety* explains that when an insurer believes facts outside the complaint justify rejecting its duty to defend, the insurer has two options. The insurer

can agree to defend under a reservation of rights or file an action for declaratory relief. *Id.* (citing *Woo v. Fireman's Fund Ins. Co.*, 161 Wash.2d 43, 164 P.3d 454, 460 (2007); Restatement of Liability Insurance § 13 cmt. c.). Indeed, Nevada law "forcefully encourage[s] insurers to offer to defend doubtful claims" based on the broad duty to defend. *Nautilus*, 482 P.3d at 690, citing *Century Sur.*, 134 Nev. at 822 n.4, 432 P.3d at 184 n.4.

77.    The Policy includes standard endorsements on CLTA Forms 100 and 115.1.[24]

78.    At the time it provided the Policy to Lender, Defendants were aware of the HOA's CC&Rs, the HOA's lien for unpaid assessments, and the fact that the lien could take priority over the Deed of Trust pursuant to NRS Chapter 116.

79.    In or around 2011, Borrower ceased making payments to the HOA for monthly assessments, in violation of his covenant under Section 17.1 of the CC&Rs.

80.    On April 30, 2012, the HOA, through its agent, LJSG, recorded a Notice of Foreclosure Sale.[25] The Notice of Sale was not mailed to U.S. Bank's predecessor in interest.

81.    On September 13, 2012, the HOA sold the Property at foreclosure ("HOA Sale"), conveying itself, and subsequently SFR Investments Pool 1, LLC ("HOA Buyer").[26] The Foreclosure Deed confirms that the Property was conveyed to the HOA Buyer pursuant to NRS Chapter 116 and the CC&Rs.[27]

82.    On October 9, 2015, U.S. Bank's predecessor submitted a claim to Lawyers Title, Fidelity National's predecessor in interest.[28] In the Claim, U.S. Bank requested that the Company fulfill its obligations to cure the title defects, defend U.S. Bank and indemnify U.S. Bank against losses.[29]

83.    In response, on October 26, 2015, Emily M. Gordon, Claims Counsel for Fidelity National sent U.S. Bank's predecessor a letter ("Initial Response").[30] In the Initial Response,

---

[24] **Exhibit 1**.
[25] A true and correct copy of the Notice of Foreclosure Sale is attached as **Exhibit 12**.
[26] A true and correct copy of the Foreclosure Deed is attached as **Exhibit 13**.
[27] *Id.*
[28] A true and correct copy of the Claim Letter is attached as **Exhibit 14**.
[29] *Id*.
[30] A true and correct copy of Fidelity National's Initial Response Letter is attached as **Exhibit**

Fidelity National admitted that "[a]lthough the claim falls within the purview of the insuring provisions, at this time, the Insured has not suffered any actual loss or damage, nor has a lawsuit been initiated or a response filed to the request for Alternative Dispute Resolution challenging the validity, enforceability, or priority of the Insured DOT. Accordingly, the Company has no present obligation of indemnity or defense."[31]

84.    Fidelity National went on to state in the Initial Response,

[T[he Company recognizes that it may have an obligation to indemnify or defend the Insured in the future. In this regard, the Company requests that the Insured immediately notify the Company in the even the Insured receives notice or otherwise becomes aware of a legal challenge to the validity, enforceability, or priority of the Insured DOT. Upon receipt of notice from the Insured regarding either of the foregoing, the Company will immediately reevaluate its obligations under the Policy.[32]

85.    Despite the foregoing, Fidelity National then went on to state that "the Company did not receive this claim tender under October 13, 2015, which was three years after the Panorama Lien's completed foreclosure. The late notice prejudiced the Company's ability to satisfy the Panorama Lien or initiate an action to resolve the potential priority dispute."[33]

86.    On October 12, 2015, U.S. Bank's predecessor filed a lawsuit against the HOA Buyer seeking a judicial declaration that the HOA Sale did not extinguish the Deed of Trust ("Litigation").[34] Then on March 21, 2016, the HOA Buyer filed its Answer to the Complaint, Counterclaim and Cross-Claim seeking a declaration that the Deed of Trust was extinguished by the HOA Sale.[35]

87.    Upon information and belief, in October 2016, U.S. Bank's predecessor resubmitted its claim to Fidelity National and Fidelity National accepted the tender of defense and retained counsel to represent U.S. Bank's predecessor in the Litigation.

---

**15**.
[31] *Id*. at p.2.
[32] *Id*.
[33] *Id*.
[34] A true and correct copy of the Quiet Title Complaint is attached as **Exhibit 16**.
[35] A true and correct copy of the Answer, Counterclaim and Cross-Claim is attached as **Exhibit 17**.

88.     In July 2017, Fidelity National then sent a letter to U.S. Bank's predecessor stating that it was withdrawing coverage because: (1) "Bank of America had actual knowledge of the HOA Lien and impending foreclosure"; and (2) U.S. Bank's predecessor, Bank of America, had actual knowledge of "material facts of the HOA Lien's related foreclosure, at a minimum, [which] obligated the Bank of America to promptly tender written notice of this Claims to the Company as set forth in Section 3 of the Policy's conditions and Stipulations or otherwise mitigate its damage."[36] Further, Fidelity National contended that "Bank of America had notice pursuant to Nevada law that the HOA Lien might extinguish the Insured DoT. Nevertheless, the Bank of America did not notify the Company of any of these events until October 16, 2015…The Company was prejudiced by this delay and deprive of its ability to cure the Super-Priority of the HOA Lien prior to the HOA Lien's foreclosure sale…Therefore, pursuant to Section 3 of the Policy's Conditions and Stipulations, the Company's liability for this claim is limited to the amount of the Super-Priority[.]"[37]

89.     On February 8, 2018, U.S. Bank's predecessor requested reconsideration of the withdrawal of coverage.[38] And on February 28, 2018, Fidelity National sent a response, again denying coverage under paragraph 3 of the Conditions and Stipulations in the Policy.[39]

90.     The Litigation resulted in judgment in favor of HOA Buyer. U.S. Bank appealed and the appeal remains pending. U.S. Bank continues to expend attorney's fees and costs to defend itself against HOA Buyer's claims.

91.     Condition No. 3 states:

> The Insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 5(a) of these Conditions, (ii) in case Knowledge shall come to an Insured of any claim of title or interest that it adverse to the Title or the lien of the Insured Mortgage, as insured, and that might cause loss or damage for which the Company may be liable by virtue of this policy, or (iii) if the Title or the lien of the Insured Mortgage, as insured, is rejected as Unmarketable Title. If the Company is prejudiced by the failure of the Insured Claimant to provide

---

[36] A true and correct copy of the Coverage Withdrawal letter is attached as **Exhibit 18**.
[37] *Id.*
[38] A true and correct copy of the Reconsideration letter is attached as **Exhibit 19.**
[39] A true and correct copy of the Second Denial letter is attached as **Exhibit 20**.

prompt notice, the Company's liability to the Insured Claimant under the policy shall be reduced to the extent of the prejudice.[40]

92.    "Knowledge" is defined in the Policy as "Actual knowledge, not constructive knowledge or notice which may be imputed to an Insured by reason of the Public Records or any other records that impart constructive notice of matters affecting the Title."[41]

93.    "Cases construing the term "actual knowledge" within the context of insurance policies generally means that "insureds must actually know that a particular matter has an adverse affect on the insured title." *Pennymac Holdings, LLC v. Fidelity Nat'l Ins. Co.*, 2018 Nev. LEXIS 721 (July 30, 2018) (unpublished disposition) (quoting *Title Insurance Law* § 8:5 (Sept. 2017).

94.    The Coverage Withdrawal letter argues that U.S. Bank's predecessor failed to give Fidelity National prompt notice but is silent on the "actual knowledge" prerequisite set forth in Condition No. 3.[42]

95.    U.S. Bank did not have actual knowledge that the HOA's lien was an adverse claim of title.

96.    Fidelity National has waived its right to challenge U.S. Bank's lack of knowledge and is estopped from denying coverage thereon. *See McKeeman v. Gen. Am. Life Ins. Co*., 111 Nev. 1042, 1050, 899 P.2d 1124, 1129 (1995) ("An insurer may by its conduct or dealings apart from the policy itself be estopped from denying that coverage has been furnished for a risk which the insured has been led to believe is covered."); *Nautilus Ins. Co. v. Access Med*., LLC, 482 P.3d 683, 690 (Nev. 2021) (recognizing the requirement to reserve rights "where one party is claiming as of right something which the other believes to be unwarranted"); *Teriano v. Nev. State Bank (In re Harrison Living Tr.),*121 Nev. 217, 222, 112 P.3d 1058, 1061 (2005) (citing *Topaz Mutual Co. v. Marsh*, 108 Nev. 845, 853, 839 P.2d 606, 611 (1992) ("silence can raise an estoppel quite as effectively as can words.")).

97.    Adequate notice of an adverse claim is an issue of fact. *Pennymac*, at *6 (citing *Green Tree Servicing, LLC v. Chicago Title Ins. Co.*, 499 S.W.3d 771, 776-77 (Mo. Ct. Ap. 2016).

---

[40] **Exhibit 1**.
[41] *Id*.
[42] **Exhibit 18**.

98. In the claim denial letter, Fidelity National contends that it was prejudiced by late notice of U.S. Bank's predecessor's claim as grounds to deny both its duty to defend and its duty to indemnify its insured.[43]

99. Fidelity National went outside the facts of the quiet title complaint to justify its refusal to defend U.S. Bank.

100. Fidelity National did not continue to defend under a reservation of rights or seek declaratory relief to otherwise determine its duty to defend U.S. Bank.

101. On information and belief, Defendants developed specific coverage positions and claims handling guidance for claims related to Nevada association foreclosure sales.

102. On information and belief, the coverage positions as to such claims nominally taken by Defendants and its affiliates reflect the claims handling and coverage positions adopted by Fidelity.

103. Because Defendants disregard their status as distinct organizations in the handling of claims, Defendants are alter egos for the purpose of liability related to issuance of the Policy and their handling of U.S. Bank' Claim.

104. Defendants are responsible for the acts and omissions related to the Policy because Defendants acted or failed to act at one another's direction. Additionally, because Fidelity National's predecessor in interest entered into a contractual relationship with U.S. Bank' predecessor in interest to procure coverage of the priority of the Deed of Trust over the HOA's lien—to the extent coverage is not afforded under the Policy, Fidelity National is an alter ego of Fidelity and as a result of its failure to procure coverage as requested.

105. Because Fidelity National breached its contract with U.S. Bank' predecessor-in-interest and made material representations to the Insured, Fidelity National is an alter ego of Fidelity for the purpose of liability.

106. To the extent the Defendants are not alter-egos, Defendants were involved in a joint venture that subjects Fidelity National and the other Defendants to liability equal to that of

---

[43] **Exhibits 15, 18 and 20**.

Fidelity National. The individuals responsible for handling U.S. Bank' Claim were/are employed by or otherwise directed by Fidelity. Fidelity has a vested pecuniary interest in the outcome of its claim decisions. Fidelity was further responsible for the development of Fidelity National's claim-handling and/or underwriting practices, and for otherwise directing which policies were sold to whom and how claims were to be handled.

**FIRST CAUSE OF ACTION**
**(Declaratory Judgment – all Defendants)**

107.    The allegations in Paragraphs 1 through 106 above are expressly incorporated by reference.

108.    This Court has the power and authority to declare U.S. Bank and Defendants' rights and legal relations in connection with the Policy.

109.    An actual controversy has arisen between U.S. Bank, on the one hand, and Defendants, on the other, as to whether the Policy provides coverage to U.S. Bank for losses caused by the HOA's foreclosure of its purportedly senior lien.

110.    The Policy provides coverage for all losses and damages sustained by U.S. Bank as a result of the HOA Sale.

111.    Additionally, the insured complied with all material obligations under the Policy, including Condition and Stipulation 3.

112.    Fidelity National – acting at Fidelity's direction – nevertheless failed to continue to defend its Insured based on its findings that the Insured failed to comply with Condition and Stipulation 3.[44]

113.    U.S. Bank is entitled to a declaration that the Policy provided coverage for all losses or damages, up to the Amount of Insurance, plus attorney's fees and costs to defend the insured and the insured mortgage, sustained by U.S. Bank as a result of the HOA Sale.

114.    U.S. Bank was required to retain counsel to prosecute this action and is entitled to recover its corresponding attorneys' fees.

/ / /

---

[44] *See* **Exhibits 15, 18 and 20** (Denial Letters).

## SECOND CAUSE OF ACTION
### (Breach of Contract – all Defendants)

115.    The allegations in Paragraphs 1 through 114 above are expressly incorporated by reference.

116.    U.S. Bank is the insured under the Policy by reason of an assignment of all rights and interest under the Deed of Trust and indebtedness under the promissory note secured by the Deed of Trust.

117.    U.S. Bank complied with all material conditions under the Policy, including Condition and Stipulation 3.

118.    The Policy gave rise to a duty to defend U.S. Bank in any litigation arising from a challenge to the validity or priority of U.S. Bank' Deed of Trust and to either cure the defects on title or indemnify U.S. Bank for any losses it sustained as a result of the loss of priority or extinguishment of its Deed of Trust.

119.    As described above, Defendants are alter egos for the purpose of liability for the handling and denial of U.S. Bank' Claim, or are otherwise engaged in a joint venture.

120.    Additionally, because Fidelity National entered into a contractual relationship with U.S. Bank' predecessor-in-interest in order to insure the Deed of Trust in senior position over the HOA's Lien, to the extent coverage is *not afforded* under the Policy, Fidelity National breached its contract with U.S. Bank's predecessor.

121.    As described above, U.S. Bank has suffered an insured loss and damages under the Policy.

122.    Fidelity National – acting at Fidelity's direction – breached the Policy by refusing to indemnify U.S. Bank for its covered losses.

123.    Fidelity National – acting at Fidelity's direction – further breached the Policy by refusing to defend U.S. Bank for the entirety of the quiet title action, including but not limited to any appeal thereof.

124.    These breaches of the Policy at Fidelity's direction have proximately resulted in general and special damages to U.S. Bank, including attorneys' fees and litigation expenses,

which U.S. Bank has incurred and will continue to incur.  Such damages and expenses should be paid by the Insurer under the Policy's terms.

125.    As a result of these breaches of the Policy at Defendants' direction, U.S. Bank was required to retain counsel to prosecute this action and is entitled to recover its corresponding attorneys' fees.

### THIRD CAUSE OF ACTION
### (Bad Faith / Breach of the Covenant of Good Faith and Fair Dealing – all Defendants)

126.    The allegations in Paragraphs 1 through 125 above are expressly incorporated by reference.

127.    As described above, Defendants are alter egos for the purpose of liability for the handling of U.S. Bank' Claim, or are otherwise engaged in a joint venture.

128.    All Defendants owed U.S. Bank a duty to act in good faith and in a manner consistent with fair dealing in their considerations of U.S. Bank' claims under the Policy, including a duty of candor and to avoid denials of claims without reasonable basis.

129.    All Defendants acted with malice, fraud, and/or oppression by allowing U.S. Bank' predecessor to obtain a title insurance policy that included an endorsement known and described as providing coverage against the enforcement of an association's superpriority lien, then denying coverage for losses arising from the HOA's enforcement of its superpriority lien.

130.    Defendants have implemented and engaged in patterns and practices which call for the denial of claims stemming from Nevada HOA foreclosure sales despite Defendants' actual knowledge that the claims fell under the insuring provisions and policy endorsements, including U.S. Bank' Claim. These patterns and practices demonstrate that Defendants did not simply make a reasonable mistake, but engaged in a systemic and reckless and/or intentional practice of mishandling and denying otherwise valid claims in order to avoid their obligations.

131.    Defendants intentionally breached their duties and acted in bad faith by denying U.S. Bank' claims for coverage under the Policy

132.    Defendants further intentionally breached their duties and acted in bad faith by failing to continue to defend U.S. Bank in the underling Litigation.

133.   U.S. Bank has suffered damages as a result of Defendants' bad faith and breach of their duty of good faith and fair dealing.

134.   As a result of Defendants' bad faith, U.S. Bank was required to retain counsel to prosecute this action and is entitled to recover its corresponding attorneys' fees.

**FOURTH CAUSE OF ACTION**
**(Deceptive Trade Practices (NRS 41.600 and NRS 598.0915) – all Defendants)**

135.   The allegations in Paragraphs 1 through 134 above are expressly incorporated by reference.

136.   As described above, Defendants are alter egos for the purpose of liability for the handling and denial of U.S. Bank' Claim, or are otherwise engaged in a joint venture.

137.   All Defendants received valuable consideration in exchange for providing the Policy to U.S. Bank' predecessor.

138.   All Defendants exchanged memoranda, bulletins, underwriting guides, and other communications indicating that Form 100 and Form 115.1 would provide coverage if an insured mortgage lien was impaired or otherwise affected by the enforcement of an association's superpriority lien.

139.   The Policy U.S. Bank' predecessor-in-interest obtained from Fidelity National contained endorsement language plainly intended to provide coverage in the event the Deed of Trust lost priority or was otherwise impaired by operation of the HOA's CC&Rs.

140.   On information and belief, Fidelity National knew or had reason to know that the HOA's CC&Rs did not include a mortgage savings clause, yet represented to the Insured that the CC&Rs did protect the Deed of Trust from extinguishment by enforcement of the HOA's lien.

141.   U.S. Bank relied to its detriment upon Defendant's representations that Form 100 and Form 115.1 would provide such coverage by originating the mortgage loan in reliance on those representations.

142.   U.S. Bank relied to its detriment upon Defendant's representations that the CC&Rs contained a mortgage savings clause when in fact the CC&Rs via operation of law and

incorporation of NRS 116 by reference, provided that the HOA lien was superior to the Deed of Trust.

143.    By representing that Form 100 and Form 115.1 provided such coverage at origination, as well as in response to U.S. Bank's claim, then failing to accept coverage, Defendants engaged in consumer fraud as that term is defined in NRS 598.0915(5), (15) and NRS 41.600(2)(e) by misrepresenting the quality and characteristics of the Policy furnished to U.S. Bank' predecessor and making false representations in the transaction.

144.    By representing that Deed of Trust was protected under the Policy, then failing to accept coverage under the Policy, Defendants engaged in consumer fraud as that term is defined in NRS 598.0915(5), (15) and NRS 41.600(2)(e) by misrepresenting the quality and characteristics of the Policy furnished to U.S. Bank' predecessor and making false representations in the transaction.

145.    U.S. Bank has suffered damages as a result of Defendants' consumer fraud, including the damages described above.

146.    As a result of Defendants' deceptive practices, U.S. Bank was required to retain counsel to prosecute this action and is entitled to recover its corresponding attorneys' fees.

## FIFTH CAUSE OF ACTION
### (Violation of NRS 686A.310 – all Defendants)

147.    The allegations in Paragraphs 1 through 146 above are expressly incorporated by reference.

148.    On information and belief, Fidelity's Claims Department handles claims made on policies underwritten by all of its subsidiaries, including Fidelity National, and directs the coverage positions to be taken by its subsidiaries to promote consistency in claims handling.

149.    As described above, Defendants are alter egos for the purpose of liability for the handling and denial of U.S. Bank' Claim.

150.    All Defendants exchanged memoranda, bulletins, underwriting guides, and other communications indicating that Form 100 and Form 115.1 would provide coverage if an insured

mortgage lien was impaired or otherwise affected by the enforcement of an association's superpriority lien.

151.    Defendants represented to the Insured that Form 100 and Form 115.1 provided coverage in the event that the Deed of Trust lost priority or was otherwise impaired by operation of the HOA's CC&Rs.

152.    Defendants represented to the Insured that the Deed of Trust was covered by the Policy.

153.    The Insured relied to its detriment upon Defendants' knowing misrepresentations regarding the protection afforded Policy at the time of issuance of the Policy and in response to U.S. Bank's claim thereunder.

154.    The Insured relied to its detriment upon Defendant's knowing misrepresentations regarding the characteristics and scope of coverage provided by the Policy with Form 100 and Form 115.1 by originating the mortgage loan in reliance on those misrepresentations.

155.    By representing that Form 100 and Form 115.1 provided coverage in the event the Deed of Trust lost priority or was otherwise impaired by operation of the HOA's CC&Rs, and then denying coverage for losses related to the HOA's foreclosure sale on other grounds after admitting coverage existed, Defendants breached NRS 686A.310(1)(a).

156.    In light of Defendants' knowledge that Form 100 and Form 115.1 provided coverage in the event a senior deed of trust was impaired by a Nevada association's superpriority lien, Defendants were required to adopt and implement reasonable claims handling procedures to provide such coverage. Defendants failed to do so, and instead implemented claims handling procedures that called for the denial by any means of claims by insured lenders whose deeds of trust were impaired by Nevada association's liens, in violation of NRS 686A.310(1)(c).

157.    By affirming the existence of coverage under the Policy for U.S. Bank's claim and then failing to effectuate coverage within a reasonable time after proof of loss, Defendants violated NRS 686A.310(1)(d).

158.    The Insurer's liability under the Policy for the extinguishment of the Deed of Trust was "reasonably clear," as shown by Defendants' internal memoranda, bulletins, underwriting

guides, and other communications.  By failing "to effectuate [a] prompt, fair, and equitable settlement[]" of U.S. Bank' Claim, Defendants violated NRS 686A.310(1)(e).

159.    By compelling U.S. Bank' "to institute litigation to recover amounts due under" the Policy, Defendants violated NRS 686A.310(1)(f).

160.    Indeed, Defendants implemented patterns and practices which call for the denial of claims stemming from Nevada HOA foreclosure sales, including U.S. Bank' Claim, despite Defendants' actual knowledge that the claims fell under the insuring provisions and policy endorsements.

161.    As a result of Defendants' deceptive practices, U.S. Bank was required to retain counsel to prosecute this action and is entitled to recover its corresponding attorneys' fees.

**PRAYER FOR RELIEF**

WHEREFORE, U.S. Bank requests that this Court grant judgment in its favor and against the Defendants, and award U.S. Bank:

A.    a declaration establishing (1) that the Policy provided coverage for all losses or damages, up to the Amount of Insurance, sustained by U.S. Bank as a result of the HOA's foreclosure sale; and (2) which of Defendants is responsible for coverage under the Policy;

B.    compensatory damages;

C.    punitive damages;

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

D.    attorneys' fees;

E.    costs; and

F.    any other relief deemed to be just.

DATED this 20th day of September, 2021.

WRIGHT, FINLAY & ZAK, LLP

*/s/ Lindsay D. Dragon*
Darren T. Brenner, Esq.
Nevada Bar No. 8386
Lindsay D. Dragon, Esq.
Nevada Bar No. 13474
7785 W. Sahara Ave., Suite 200
Las Vegas, NV 89117
*Attorneys for Plaintiff, U.S. Bank National*
*Association as Legal Title Trustee for Truman*
*2016 SC6 Title Trust*

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(b) and Electronic Filing Procedure IV(B), I certify that on the 20th day of September, 2021, a true and correct copy of this **FIRST AMENDED COMPLAINT** was transmitted electronically through the Court's e-filing electronic system to the attorney(s) associated with this case.

*/s/ Faith Harris*
An Employee of WRIGHT, FINLAY & ZAK, LLP

## EXHIBIT LOG

| Exhibit 1 | Title Insurance Policy |
|-----------|------------------------|
| Exhibit 2 | Chicago Title's 2013 Endorsement Manual |
| Exhibit 3 | Fidelity's Endorsement Guide |
| Exhibit 4 | Stewart Title's 1991 Bulletin |
| Exhibit 5 | Stewart Title's 1993 Bulletin |
| Exhibit 6 | LandAmerica's Underwriting Manual |
| Exhibit 7 | Fidelity's 2013 Endorsement Manual |
| Exhibit 8 | Stewart Title Bulletin NV2014002 |
| Exhibit 9 | HOA's 2006 CC&Rs |
| Exhibit 10 | Deed of Trust |
| Exhibit 11 | Assignment of Deed of Trust |
| Exhibit 12 | Notice of Foreclosure Sale |
| Exhibit 13 | Foreclosure Deed |
| Exhibit 14 | Claim Letter |
| Exhibit 15 | Fidelity National's Initial Response Letter |
| Exhibit 16 | Quiet Title Complaint |
| Exhibit 17 | Answer, Counterclaim and Cross-Claim |
| Exhibit 18 | Coverage Withdrawal Letter |
| Exhibit 19 | Reconsideration Letter |
| Exhibit 20 | Second Denial Letter |